The Law Offices of Barbara B. Comerford, P.A.
45 Eisenhower Drive, Suite 280
Paramus, New Jersey 07652
Telephone: 201-485-8806
Fax: 201-485-7014
**Attorneys for Plaintiff Lisa Correa**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA CORREA | |
| Plaintiff, | Civil Action No. |
| vs. | COMPLAINT |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY | |
| Defendant | |

Plaintiff, Lisa Correa (hereinafter "Plaintiff" or "Dr. Correa"), by way of Complaint against the Defendant, alleges as follows:

**JURISDICTION**

1. Plaintiff resides at 16007 Muirfield Drive, Odessa, Florida 33556.

2. Defendant Massachusetts Mutual Life Insurance Company (hereinafter "Defendant" or "Mass Mutual") is an insurance company organized and existing under the laws of the Commonwealth of Massachusetts, with a headquarters located at 1295 State Street, Springfield, MA 01111.

3. At all relevant times, Plaintiff was and is insured under disability insurance policy number 8659922 ("the Policy), issued by Defendant (Exhibit A). Dr. Correa is the policyholder and beneficiary under the terms of the Policy.

4. This Court has personal jurisdiction over this action in that Defendant is incorporated and maintains its principal place of business in Massachusetts.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the parties herein are diverse.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c) in that the Defendant is incorporated and maintains its principal place of business in Massachusetts.

## ESSENTIAL FACTS

7. Dr. Correa is a 45-year-old woman.

8. Dr. Correa earned her undergraduate degree from Boston College.

9. Dr. Correa completed a 5-year joint Psy.D. and M.B.A. degree at Widener University in 2005.

10. After completing an internship and post-doctoral requirements, Dr. Correa earned her license and in October 2007 she started her own psychology practice in Tampa, Florida. At the end of 2008, Dr. Correa founded her company, Achieve Wellness Group. She not only functioned as a licensed psychologist for the company, but also ran and grew the company from a business perspective. She performed psychological services, conducting evaluations, therapy, and consultations. She also was the principal strategist and planner, applying her skills and knowledge from her MBA degree as well. She handled finance, accounting, and bookkeeping, working closely with her co-owner, account, financial planner, and billing manager. She consulted with attorneys regarding healthcare compliance and in developing and updating contracts and agreements. She handled marketing and sales, meeting with potential and current clients (i.e., long-term care facilities), public relations, web development and human resources.

11. Due to her due to her disability, Dr. Correa has been forced to discontinue her own practice of psychology and has also been unable to handle the business aspects of the practice.

12. During the cesarean birth of her second child in May 2014, Dr. Correa suffered a uterine rupture and bladder tear. She was told to anticipate a recovery period of a year.

13. Dr. Correa did not regain her health in the year following her second child's birth. Instead, her physical health deteriorated.

14. As her health deteriorated, Dr. Correa experienced increasing and severe symptoms of what was ultimately diagnosed as Fibromyalgia and Myalgic Encephalomyelitis ("ME/CFS") including debilitating fatigue; post exertional malaise ("PEM"); dizziness; migraines; cognitive difficulties including difficulty with memory, focusing, organization, information processing, and word recall; brain fog; sensitivity to noise, light, sound and smell; chronic pain including in the arms, neck, shoulders and feet; and gastrointestinal dysfunction.

15. Several of Dr. Correa's close family and friends have provided certifications of their observations of Dr. Correa's illness and disability and the way it has impaired her ability to function on a basic level as she had prior to her disability. Their certifications document the impact of Dr. Correa's disability on daily activities, and that she struggled to drive long distances; run errands; carry on a conversation; remember basic daily tasks without reminders; create shopping lists for the grocery store; perform household chores; participate in activities with her children; exercise as she had previously done regularly; recover from debilitating pain and fatigue after only modest exertion; or sit upright for extended periods of time.. Certifications also documented that Ms. Correa sometimes relied on an electric wheelchair for mobility outside the home, but that she was often still debilitated when she returned home.

16. Ms. Correa tried to continue working, which became increasingly difficult and ultimately impossible due to her physically debilitating conditions and symptoms.

17. Ultimately, Dr. Correa was forced to cease working altogether while her husband and employees ran the business in her absence.

18. In March 2016, Dr. Correa submitted her claim for disability benefits under the Policy to MassMutual describing her symptoms as IBS, musculoskeletal pain, and c-section/uterine rupture.

19. Dr. Correa applied for and was awarded disability benefits by the Social Security administration based upon her inability to perform any substantial gainful work.

20. On March 30, 2016, Dr. Correa was seen by Board Certified rheumatologist Shanmugapriya Reddy, M.D., for joint pain and stiffness on multiple sites and fatigue. Dr. Reddy diagnosed Ms. Correa with Fibromyalgia, malaise, and chronic fatigue.

21. On June 10, 2016, Dr. Correa visited Dr. Reddy, who examined Dr. Correa and found greater than 11 out of the 18 tender points associated with Fibromyalgia. Dr. Correa reported pain in hands, feet, thumbs, hips, shoulder, and forearms along with chest pain, abdominal pain, muscle pain, and lack of sleep. Aggravating factors included increased exertion, sitting, and standing.

22. Fibromyalgia is a valid medical diagnosis recognized by the American College of Rheumatology that can be –and in Dr. Correa's case is –physically impairing.

23. On September 15, 2016, Dr. Correa was evaluated by Board Certified Family Medicine specialist Peggy Watson, M.D.  Dr. Watson noted that Dr. Correa suffered with symptoms including IBS "so severe she was in bed/fatigued." Dr.  Watson noted joint and muscle pain; chronic headaches; sensitivity to light, sound, scents, and chemicals; migraines; nausea; fatigue; abdominal pain; swelling; stiffness; brain fog; arthralgias; and myalgias.

24. After evaluating Dr. Correa again on October 5, 2016, Dr. Watson noted: "I believe she is severely impaired and agree with her not working…she needs to be able to take the time to…see physicians, eat well, sleep well and above and beyond that, she is actually incapable of even safely doing her job."

25. Dr. Watson noted that Dr. Correa was on Fioricet for migraines and that her intractable pain all over contributed to poor sleep. Her abdominal pain and IBS with diarrhea persisted despite exhaustive work with her dietician and she was referred to a gastroenterologist.

26. On October 14, 2016, Dr. Correa returned to Dr. Reddy complaining of severe fatigue and pain. She noted that Dr. Correa was taking Cymbalta without relief of myalgias. Dr. Reddy continued to assess Fibromyalgia, malaise, and chronic fatigue.

27. On October 21, 2016, Dr. Correa was evaluated by Family Medicine Specialist Larnel Sultan, D.O., who assessed physical diagnoses of Fibromyalgia, chronic fatigue, chronic pain syndrome, myalgia, migraine, and IBS.

28. Dr. Correa's disabling symptoms continued through the end of 2016.

29. On January 26, 2017, Dr. Correa was evaluated by Integrated Medicine Specialist Ron Shemesh, M.D., who agreed with the diagnosis of Fibromyalgia.

30. On March 15, 2017 – approximately one year after Dr. Correa submitted her claim for disability benefits, Mass Mutual advised that it would begin making disability payments to Dr. Correa retroactive to March 2016. However, despite the evidence documenting Dr. Correa's physical disability, Mass Mutual only agreed to pay Dr. Correa under a reservation of rights at that time "in order to determine the primary basis of any ongoing impairment."

31. As of March 15, 2017, at least four doctors had evaluated Dr. Correa and agreed with the physical diagnosis of Fibromyalgia.

32. In her office visit note of May 25, 2017, Dr. Watson noted that Dr. Correa had suffered more than three months of chronic pain and multiple trigger points, and that she had no doubt that Dr. Correa was accurately diagnosed with Fibromyalgia.

33. In June 2017, Dr. Correa began low dose immunotherapy for her chronic pain, and Dr. Watson noted that Dr. Correa continued to suffer pain bilaterally above and below the waist, and at the axial spine, lower back, and ribs/chest. Dr. Watson documented 18 out of 18 tender points associated with Fibromyalgia.

34. Mass Mutual required that Dr. Correa submit to a neuropsychological Insurance Medical Examination ("IME") with Heather Belanger, Ph.D. A review of Dr. Belanger's credentials revealed no experience or expertise in treating or evaluating patients such as Dr. Correa who suffer from ME/CFS and Fibromyalgia.

35. Dr. Belanger performed two consecutive days of testing. She noted that Dr. Correa appeared to exert reasonable effort during the evaluation but as the day went on, she showed signs of tiring and needed many breaks. She told Dr. Belanger on the second day that after the first day she fell asleep in the car and when she got home, she was too tired to even speak with her family.

36. Dr. Belanger performed embedded validity tests, which revealed that Dr. Correa exhibited valid effort during the testing.

37. Dr. Belanger's testing documented difficulties with fine motor speed and cognitive inhibition.

38. Dr. Belanger's psychological review of Dr. Correa found she did not fulfill diagnostic criteria for PTSD, depression, anxiety, or other mood disorders.

39. Dr. Belanger administered the MMPI-2-RF, which is an inventory of symptoms that examinees are asked to endorse. The use of the MMPI-2-RF is inappropriate in Dr. Correa's

6

case because individuals with severe physical illness such as Dr. Correa endorse more symptoms and score higher on the protocol.

40. Dr. Belanger, acknowledged in her report that Dr. Correa's "possible over-reporting of responses could be due to her multiple medical conditions."

41. According to the DSM-V, the diagnosis of somatic symptom disorder requires "excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns as manifested by at least one of the following:

1. Disproportionate and persistent thoughts about the seriousness of one's symptoms;
2. Persistently high level of anxiety about health or symptoms;
3. Excessive time and energy devoted to these symptoms or health concerns."

42. Dr. Belanger conceded it was not her role or area of expertise to assess Dr. Correa's physical functioning and noted that it is beyond her purview to comment on any physical limitations. Consequently, Dr. Berlanger is by her own admission not qualified to attribute Dr. Correa's disability to a somatoform disorder.

43. The substantial medical evidence of record documents that Dr. Correa is totally disabled by the physical diagnoses of ME/CFS and Fibromyalgia and is not disabled by a mental illness.

44. Despite the substantial medical evidence of record, and Dr. Belanger's own admission that she cannot determine whether Dr. Correa suffers from a somatic symptom disorder, Mass Mutual sent a letter to Dr. Correa dated August 31, 2017 advising that it was applying the Policy's Mental Disorder limitation to Dr. Correa's disability claim.

45. The Policy contains a Mental Disorder limitation, which states, 'The Maximum Benefit Period is 24 months for each period of Disability caused or contributed to by a Mental Disorder."

46. The Policy defines "Mental Disorder" as follows:

Mental Disorder means any disorder classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association, most current as of the date of Disability. Mental Disorder includes, but is not limited to a mental, emotional or behavioral disorder, or a disorder related to stress or to substance abuse or dependency. If the DSM is discontinued or replaced, Mental Disorder will include those disorders classified in the diagnostic manual then in use by the American Psychiatric Association as of the date of Disability.

47. On January 2, 2018, Dr. Correa submitted an appeal of Mass Mutual's application of the Policy's Mental Illness limitation. This appeal documented the substantial medical evidence of physical disability in the record, and how same disables Dr. Correa.

48. Dr. Correa remained physically disabled under the terms of the policy through 2018 and into 2019.

49. Despite the substantial medical evidence of record, Mass Mutual sent a letter to Dr. Correa terminating her claim as of December 31, 2018, upholding its application of the Policy's 24-month mental nervous limitation and improperly applying same to limit her disability claim.

50. Mass Mutual's termination letter relied upon Dr. Belanger's report and the paper file review of an infectious disease specialist. The infectious disease specialist disregarded the substantial medical evidence of disabling fibromyalgia, headaches, and gastrointestinal disorder by focusing on the normal findings in the records and ignoring abnormal findings; ignoring objectively documented tender point exams which are evidence of Dr. Correa's diagnoses of Fibromyalgia and of her disability; and by improperly disregarding those of Dr. Correa's symptoms that are self-reported.

51. Despite Mass Mutual's termination, Dr. Correa has remained totally physically disabled and entitled to benefits under the Policy.

52. On April 30th, March 9th, and March 10th of 2019, Dr. Correa was evaluated by Richard Podell, M.D. Dr. Podell has served as a Clinical Professor, University of Medicine and Dentistry of New Jersey-Robert Wood Johnson Medical School, Department of Family Medicine. Dr. Podell is a Harvard-trained physician who is board-certified in internal medicine and family practice. He is a well-respected expert in treating patients with ME/CFS and FM and has published multiple articles on diagnosis and treatment for such patients. Dr. Podell has sat on the American Association for CFS Board (now the IACFS) which is dedicated to research and treatment of CFS patients.

53. On physical examination, Dr. Podell noted tachycardia increase with standing. All 18 of the standard 18 Fibromyalgia diagnostic tender points were painful on standard pressure. Pressure at multiple other sites also elicited pain, as is typical for persons with severe Fibromyalgia and functional limitations. This well-known phenomenon has the technical term of "allodynia."

54. Dr. Podell administered the Widespread Pain Index (WPI) and the Symptom Severity score (SS). For the WPI, a score of 7 out of 19 body areas being painful during the previous week is considered to be highly significant. Dr. Correa's WPI score was 18 out of a possible 19. This is an extremely high score, documenting a severe degree of illness.

55. Dr. Correa's SS score was a 12 out of possible 12.

56. Dr. Podell also performed a formal and detailed "trigger point" examination. Trigger points are tight, physically palpable knots of muscle spasm. The spasm causes loci of low blood flow or ischemia often with widespread muscle tension and pain. Because of ischemia, repeated use of these muscles rapidly causes increased fatigue and pain, greatly limiting the ability to sustain effort. Recovery typically takes hours or days. Among Fibromyalgia patients,

the number and severity of trigger points correlates closely with the severity of functional limitations.

57.     Dr. Podell documented an abnormal number of trigger points, and noted, "These severely abnormal trigger point findings are fully consistent with Dr. Correa's reported history of severe pain, poor stamina and functional limitations. A person with this degree of severe and widespread trigger points would typically not be able to sustain muscular activity for extended periods without causing a severe and long-lasting exacerbation of symptoms."

58.     Dr. Podell administered the FIQR (Fibromyalgia Impact Questionnaire Revised) as the best validated and most accepted and standardly used measure of functional limitations for persons with Fibromyalgia. Persons with mild Fibromyalgia typically score in the 30's or 40's on the FIQR. The FIQR is the American College of Rheumatology's gold standard for assessing disability in Fibromyalgia patients.

59.     Dr. Correa's scores on the FIQR were highly elevated and abnormal. Dr. Podell explained that these scores "are not compatible with an ability to sustain regular activity such as is required by any job."

60.      Based upon Dr. Correa's medical history and his evaluations of her, Dr. Podell additionally diagnosed ME/CFS. He noted that Dr. Correa satisfies the major criteria of the Center for Disease Control for Chronic Fatigue Syndrome. That is, she has persistent debilitating fatigue that does not resolve with rest and which causes a substantial reduction from previous activity. These have lasted for longer than six months. She also satisfies the so-called minor Criteria for Chronic Fatigue Syndrome.

61.     Dr. Podell also found that Dr. Correa demonstrates severe Post Exertional Malaise (PEM) which is typical among patients with severe FM and/or CFS and documented specific examples of Dr. Correa's PEM after light or modest daily activity.

62. Based upon Dr. Correa's medical history, her symptoms, and his multiple evaluations of Dr. Correa, Dr. Correa concluded that Dr. Correa was totally disabled due to Fibromyalgia and ME/CFS.

63. Given the objectively documented severity of her illness, Dr. Podell also concluded, "As an internal medicine specialist with a major interest in both chronic fatigue syndrome and fibromyalgia, having evaluated and treated some thousands of patients, I say with confidence that Dr. Correa's symptoms, concerns and functional limitations all correspond to what we typically see among persons with severe chronic fatigue syndrome and/or fibromyalgia. As her responses are typical and appropriate, she does NOT meet the DSM-5 diagnostic criteria for any somatoform disorder." Rather, Dr. Podell concluded that Dr. Correa's level of concern is an appropriate response to her severe physical illness.

64. Due to her reported cognitive difficulties, Dr. Correa underwent a neuropsychological evaluation with Gudrun Lange, Ph.D. Dr. Lange is one of the world's foremost neuropsychologists in assessing the impact of ME/CFS upon patients' cognitive functioning. She served on the Institutes of Medicine ("IOM") Committee that issues the report "Beyond Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: Redefining an Illness" in 2015 ("The Report").

65. Dr. Lange performed a complete battery of neuropsychological testing, which Dr. Correa had to complete while supine as much as she could within the confines of test validity.

66. Dr. Lange administered performance validity measures, the results of which demonstrated that Dr. Correa exhibited appropriate effort during the testing.

67. Dr. Lange's testing of Dr. Correa revealed impairments with attention and concentration, processing speed, and working memory.

11

68. Dr. Lange tested for emotional function, and her test results were not indicative of the presence of depressive symptoms or severe anxiety. Dr. Lange noted that according to Dr. Belanger's psychiatric interview, Dr. Correa did not fulfil any psychiatric diagnosis.

69. Dr. Lange concluded, "Dr. Correa is functionally severely impaired and unable to do any work requiring her to:

- *work attentively for even short periods of time and absorb verbal or non-verbal information accurately,*
- *work effectively on any time sensitive tasks and complete them accurately and efficiently,*
- *work efficiently on any tasks that require working memory and by extension multi-tasking especially under timed conditions,*
- *work on tasks that require monitoring, tracking, sequencing, and incorporation of feedback,*
- *work in environments that are noisy, bright, and populated,*
- *work in environments that require her to bend or move up and down, and*
- *work at a computer for extended periods of time.*

70. Dr. Lange explained that Dr. Correa's cognitive profile is consistent with those of the other ME/CFS and Fibromyalgia patients she had evaluated over the past 23 years, and that "Dr. Correa is a psychiatrically healthy individual with appropriate health concerns pertaining to symptoms associating with ME/CFS and FM." Dr. Lange concluded that Dr. Correa's level of concern regarding her physical and cognitive symptoms is an "appropriate, non-pathological response to her current illness status and DOES NOT reflect an exaggerated 'somatic focus.'"

71. Dr. Correa underwent Cardiopulmonary Exercise Testing (CPET) on April 11 and 12, 2019 with Betsy Keller, Ph.D. Dr. Keller has an M.S. and Ph.D. in Exercise Science. She has been performing CPET protocol to document post-exertional malaise-related decrease in physical function in patients with ME/CFS and the Ithaca College Wellness Clinic Since 2003. This assessment of exercise tolerance and recovery is considered by many to be the *"gold standard"* for determining the capacity for work in an individual who is suffering with ME/CFS. CPET is regarded to be an accurate method for assessing functional capacity.

72.     Dr. Keller issued a report that documented that Dr. Correa's anaerobic threshold decreased by 17% from the first to the second day of testing, objectively documenting a physical incapacity to produce energy for work due to impaired recovery.

73.     Dr. Keller additionally documented that Dr. Correa had a low ventilatory/anaerobic threshold indicating moderate to severe physical impairment and a "very low threshold for exertion." Dr. Correa also exhibited an abnormal hemodynamic response to exercise consistent with dysautonomia, and low ventilation volume consistent with ventilatory muscle fatigue and/or airway/lung resistance or obstruction.

74.     Dr. Keller concluded,

> Based on the collective results of this test, Dr. Correa's ability to carry out normal daily activities is extremely limited and renders her unable to perform her own or a sedentary occupation or tolerate most normal activities of daily living. More specifically, the response to this two-day cardiopulmonary exercise test indicates that Dr. Correa would not tolerate any sedentary work, full or part-time, on an on-going basis. Any attempt to do so would provoke her symptoms. The energy requirements to get to a job and perform work would further exacerbate her symptoms and illness progression and necessitate that she misses significant time from work. For these reasons, Dr. Correa is unable to perform her own occupation as well as any sedentary occupation.

75.     On May 31, 2019, counsel for Dr. Correa submitted an appeal of Mass Mutual's termination of her disability benefits. The appeal included the reports of Dr. Podell, Dr. Lange and Dr. Keller and outlined the wrongful nature of Mass Mutual's application of the Policy's Mental Disorder limitation to Dr. Correa's claim.

**AND AS FOR A FIRST CAUSE OF ACTION**

76.     Dr. Correa repeats and re-alleges each and every allegation set forth above at paragraphs 1-75, as if fully set forth herein again.

77. Dr. Correa is and has been continuously and physically disabled within the meaning of Policy number 8659922, which is insured and administered by the Defendant, Mass Mutual. As such, Dr. Correa is entitled to benefits under the Policy and her disability never was and is not now subject to any limitation under the Policy.

78. Despite the medical evidence of record, Mass Mutual has improperly and unlawfully terminated Dr. Correa's disability benefits by applying the Policy's Behavioral Health limitation to her claim.

79. By virtue of the foregoing, Mass Mutual has breached its contract with Dr. Correa, thereby damaging Dr. Correa.

**WHEREFORE,** Plaintiff requests that this Honorable Court enter an Order as follows:

1. Declaring Dr. Correa physically disabled within the meaning of the Policy as a result of her non-limited physical conditions.

2. Ordering Mass Mutual to place Dr. Correa back on claim under the Policy retroactive to the date her claim ceased, and to pay Dr. Correa all retroactive benefits owed to her.

3. Awarding Plaintiff her costs of suit, including reasonable attorney's fees.

4. Awarding to Plaintiff interest on all unpaid benefits and waiving any and all premium charges accruing with respect to said policies of insurance.

5. Granting such other further relief as this Court may deem just and proper.

## AND AS FOR A SECOND CAUSE OF ACTION

80. Dr, Correa repeats and re-alleges each and every allegation set forth above at paragraphs 1-79 as it fully set forth herein again.

81. Mass Mutual has terminated Dr. Correa's disability benefits and has failed to reverse its termination decision despite the evidence of record.

82. Mass Mutual's termination of, and failure to reinstate Dr. Correa's disability benefits despite the evidence of record and following the appeals submitted by Plaintiff, constitutes Bad Faith in violation of Florida Statute 624.155 in that Mass Mutual's actions include but are not limited to failing in good faith to settle Dr. Correa's claim when under all the circumstances it could and should have done so had it acted fairly toward Dr. Correa; and failed to settle Dr. Correa's claim when the obligation to do so was reasonably clear.

83. Dr. Correa filed a Civil Remedy Notice pursuant to Florida Statute 624.155(3) with both the Florida Department of Financial Services and Mass Mutual.

84. In response to Dr. Correa's Civil Remedy Notice, Mass Mutual generated a letter reiterating it's unlawful and bad faith position regarding Dr. Correa's benefits, upholding its determination to apply the policy's Mental Disorder limitation to Dr. Correa, and refusing to reinstate Dr. Correa's disability benefits.

**WHEREFORE,** Plaintiff requests that this Honorable Court enter an Order as follows:

1. Declaring Dr. Correa physically disabled within the meaning of the Policy as a result of her non-limited physical conditions.

2. Declaring Mass Mutual's termination of, and failure to reinstate disability benefits to Dr. Correa to be a bad faith in violation of Florida Statute 624.155.

3. Ordering Mass Mutual to place Dr. Correa back on claim under the Policy retroactive to the cessation of her claim, and to pay Dr. Correa all retroactive benefits owed to her.

4. Awarding Plaintiff her costs of suit, including reasonable attorney's fees.

5. Awarding to Plaintiff interest on all unpaid benefits and waiving any and all premium charges accruing with respect to said policies of insurance.

6. Granting such other further relief as this Court may deem just and proper.

## CERTIFICATION

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated:  September 11, 2020          By:     *Jennifer B. Manger*
                                    _____
                                    Jennifer B. Manger
                                    The Law Office of Barbara B. Comerford
                                    45 Eisenhower Drive, Suite 280
                                    Paramus, New Jersey 07652
                                    Telephone: 201-485-8806
                                    Fax: 201-485-7014
                                    Attorneys for Plaintiff Lisa Correa